## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:17-cv-00300-MR-DLH

KARL HENRIK SUNDBERG,    )
    )
        Petitioner,    )
    )    **MEMORANDUM OF**
    vs.    )    **DECISION AND ORDER**
    )
LISA MICHELLE BAILEY,    )
    )
        Respondent.    )
_____  )

**THIS MATTER** is before the Court on the Petitioner's Verified Petition for Return of a Minor Child [Doc. 1] brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 ("the Hague Convention") and the provisions of the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610 ("ICARA"). The Court held a hearing on the Petition on December 20, 2017.

## I.    PROCEDURAL BACKGROUND

The Petitioner Karl Henrik Sundberg ("Petitioner) commenced this action on November 1, 2017, against the Respondent Lisa Michelle Bailey ("Respondent"), claiming that the Respondent had wrongfully retained the parties' four-year-old daughter, L.P.B.S. ("Child"), in the United States and

seeking the Child's return to Sweden.  [Doc. 1].  On November 22, 2017, the Court entered an Order setting this matter for hearing on December 20, 2017.  [Doc. 8].  On November 28, 2017, the Court entered another Order, upon motion of the Petitioner, staying the state court custody proceedings that had been initiated by the Respondent and declaring the state court's emergency custody order to be void and of no legal effect.  [Doc. 11].

On December 4, 2017, the Respondent filed a verified Answer to the Petitioner's Petition, denying that she had wrongfully removed or retained the Child and asserting various affirmative defenses under the Hague Convention.  [Doc. 15].

The Court conducted an evidentiary hearing on December 20, 2017, at which time the Court heard testimony from the parties as well as several of the parties' relatives.  The Court allowed the parties a brief opportunity following the hearing to submit written briefs on the issues raised at the hearing.  The parties filed their respective briefs on December 22, 2017. [Docs. 18, 19].

## II.    FINDINGS OF FACT

Based on the verified pleadings filed by the parties, as well as the testimony and exhibits introduced and admitted into evidence at the evidentiary hearing, the Court makes the following findings of fact.

The Petitioner is a citizen and resident of Sweden. He currently has no immigration status in the United States, but has the ability to travel to the United States for short periods as a tourist. The Respondent is a citizen and resident of the United States. Immediately prior to coming to the United States in September 2016, the Respondent had resided in Sweden for four years with legal immigration status.

The Petitioner and the Respondent were in a domestic relationship in Sweden from May 2012 until August 2015. The Petitioner and the Respondent were married on June 29, 2013, in Sweden. The Child was born to the Petitioner and Respondent in 2013, in Uppsala, Sweden. The Child is a citizen of both Sweden and the United States.

The Petitioner and the Respondent were divorced on August 13, 2015, in Uppsala, Sweden. Following their divorce, the Petitioner and the Respondent exercised joint custodial rights over the Child, pursuant to Swedish law. The Child resided with the Respondent on most weekdays and with the Petitioner on most weekends and holidays. The Child resided exclusively in Sweden for the first three years of her life and made occasional visits to see family in the United States. She was able to speak both Swedish and English.

In the summer of 2016, the Respondent asked the Petitioner for his permission to take the Child for an extended period to the United States. The parties discussed the possibility of all three (the Petitioner, the Respondent, and the Child) moving to the United States, if the Petitioner could obtain legal immigrant status through a work visa or some other means but no such legal status was then pursued. As a product of these discussions, on August 14, 2016, the parties signed an agreement, drafted by the Respondent, which provides, in pertinent part, as follows:

> The purpose of this letter is to state a mutual agreement between Lisa Michelle Bailey and Karl Henrik Sundberg. Lisa and Karl have shared custody of their daughter, [Child].
>
> Lisa and Karl agree to the following:
>
> 1. Lisa will leave Sweden and the European Union, with [Child], **to spend several months** in USA, where Lisa and [Child] are both citizens. Lisa and [Child] will depart from Sweden on 20 Sept. 2016, and their destination is Asheville, North Carolina, USA.
>
> 2. In May 2017, Lisa and Karl will determine a future agreement about Lisa and [Child's] residence and a plan for continuing shared custody of [Child].

[Doc. 1-7] (emphasis added). The parties discussed the possibility that the Respondent might return to Sweden sooner than May 2017. Specifically, the

Respondent expressed concern that if she were not able to find employment, she would likely run out of money by February 2017.

Six days later, on August 20, 2016, the Petitioner and the Respondent executed a Tenancy Agreement, under which terms the Respondent agreed to rent two rooms from the Petitioner in his home, for a term beginning on September 30, 2016 and ending on September 30, 2017. The Petitioner testified that the parties entered into this agreement so that the Respondent would have a place to live with the Child upon her anticipated return to Sweden. The parties concede that the Respondent did not pay any rent called for under this agreement. The Respondent testified that she executed the Tenancy Agreement simply so that she could apply for a housing allowance from the Swedish government to subsidize her rent, but that she never received this subsidy.

The Respondent maintains a Swedish bank account, into which a monthly child benefit from the Swedish government is deposited. The Respondent and the Child's mail regarding bank accounts, doctor's appointments, and other business continues to be delivered to the Petitioner's residence. The Child is still considered a patient of the Swedish healthcare system, and the Petitioner has had to reschedule several of the Child's doctor's appointments and other matters, due to the Child's absence.

Prior to the Child's departure to the United States, the parties enrolled the Child in the Swedish school system and made arrangements for the Child to attend preschool in Uppsala, Sweden, upon her return. Both the Petitioner and the Respondent talked to the Child about the impending trip beforehand, referring to it as an "adventure."

The Respondent left some of her belongings in a storage unit in the basement of the Petitioner's apartment building. Additionally, the Child has a fully furnished room in the Petitioner's apartment and still has toys and other belongings there.

The Respondent and the Child came to the United States on September 20, 2016, using one-way airline tickets. The Respondent rented a room in a house in West Asheville for herself and the Child, and the Respondent soon found employment. The parties continued to discuss the possibility of the Petitioner seeking employment in the United States and relocating there, but no affirmative steps were taken by either party to obtain a green card or work visa for the Petitioner.

After the Respondent brought the Child to the United States, the Petitioner maintained regular contact with the Child via Skype. The Petitioner traveled to the United States in December 2016 and visited with the Child and the Respondent for approximately one month. When he

visited, the Petitioner brought the Respondent some additional winter clothing that she had left in Sweden. During his visit, the Petitioner talked to the Child about the activities they planned to do in Sweden during the summer, including visiting with the Petitioner's sister and her two children. The Child was excited about returning to Sweden in the summer. The Petitioner's sister also visited the Child while she was in the United States, and it was the sister's understanding that the parties intended for the Child to return to Sweden at the beginning of the summer.

In an e-mail communication with the Petitioner in March 2017, the Respondent advised the Petitioner that she did not intend to return the Child to Sweden. The Petitioner became distraught and feared that he might never see his child again. He threatened to report the Respondent to the authorities and accused her of kidnapping the Child. In April 2017, the Respondent commenced a child custody suit in Buncombe County, North Carolina. The Petitioner did not participate in these proceedings. In June 2017, the Petitioner retained counsel in Sweden and filed an application for return of the Child under the Hague Convention with the Swedish Ministry for Foreign Affairs. The Swedish government subsequently submitted Petitioner's Application to the United States Department of State. When the Petitioner was not able to secure the return of the Child through

administrative means, he commenced the present action on November 1, 2017.  [Doc. 1].

The Petitioner testified that it was the parties' shared intent, as evidenced by their written agreement, that the Child would relocate to the United States with the Respondent only for a period of "several months," to end in or before May 2017.  The Respondent testified, on the other hand, that she had always intended to relocate with the Child to the United States permanently and that the Petitioner had consented to this.  She testified that the written agreement was couched in terms of being a temporary relocation because she wanted to continue receiving the Swedish child welfare benefit and did not want to raise the suspicion of the Swedish government.  With respect to the Tenancy Agreement, the Respondent states that the parties executed this agreement so as to allow the Respondent to reapply for a Swedish housing allowance (which she never received).  The Respondent testified that she had no intention of ever living in the Petitioner's apartment.

The Respondent testified that the Child is thriving in her new environment.  She testified that the Child attends preschool, has many friends, and has become an outgoing child.  The Child also sees the Respondent's mother and sister with some frequency, even though they live many hours away.  According to the Respondent, the Child only speaks

English now and does not understand Swedish. The Petitioner disputed this, testifying that he is still able to communicate with the Child in Swedish.

## III.  DISCUSSION AND CONCLUSIONS OF LAW

"The Hague Convention seeks to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access."  Maxwell v. Maxwell, 588 F.3d 245, 250 (4th Cir. 2009).  The primary purpose of the treaty is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001) (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993)).  The United States has implemented the terms of the Hague Convention through the enactment of ICARA.  Both the United States and Sweden are signatories to the treaty.

In order to secure the return of a child under the Hague Convention and ICARA, a petitioner must show by a preponderance of the evidence that the child was "wrongfully removed or retained" within the meaning of the Convention.  22 U.S.C. § 9003(e)(1)(A); Hague Convention, art. 3.  To establish a wrongful removal or retention, the petitioner must show:

> (1) the child was "habitually resident" in the petitioner's country of residence at the time of

removal [or retention]; (2) the removal [or retention] was in breach of the petitioner's custody rights under the law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal [or retention].

Maxwell, 588 F.3d at 250; Hague Convention, art. 3.

Here, the parties stipulated that at all times relevant to those proceedings, the Petitioner had rights of joint custody and was exercising those rights. The parties disagree, however, as to the issue of "habitual residence." The Petitioner contends that the Child's country of habitual residence was Sweden, and that the Respondent wrongfully retained the Child when she refused to return her to Sweden in accordance with the parties' written agreement. The Respondent, on the other hand, contends that with their relocation in September 2016, to which the Petitioner consented, the Child's country of habitual residence became the United States and thus no wrongful removal or retention ever occurred.

The Hague Convention does not define what constitutes a child's "habitual residence." The Fourth Circuit, along with several other courts of appeals, has adopted a two-part test, first articulated by the Ninth Circuit in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), for determining the habitual residence of a child. Under the Mozes test, the Court must first determine "whether the parents shared a settled intention to abandon the former

country of residence." Maxwell, 588 F.3d at 251 (citing Mozes, 239 F.3d at 1075). Second, the Court must determine "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the child[ ] to the new environment.'" Maxwell, 239 F.3d at 251 (quoting in part Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007)). In short, in order to show a change in the country of habitual residence, it must be shown that the parents 1) shared the intent to make such change and 2) then acted upon such intent. Ascertaining the parties' intent, however, can be a challenging task. As the Fourth Circuit has explained:

> In cases where there is a dispute regarding a child's habitual residence, the representations of the parties cannot be accepted at face value, and courts must determine habitual residence from all available evidence. Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence.

Maxwell, 588 F.3d at 252 (internal citations, quotation marks, and footnotes omitted).

## A. Shared, Settled Intent

It is clear that as of the summer of 2016, the Child's country of habitual residence was Sweden – the country in which she was born and the only country in which she had ever resided. While the parties agreed that the Child could come with the Respondent to the United States for a limited period of time, the parties did not share any settled intent to abandon Sweden as the Child's country of habitual residence. The parties' written agreement, which was drafted and signed by the Respondent, explicitly states that the Respondent and the Child would reside in the United States for a period of "several months" beginning in September 2016 and that the parties would make future arrangements regarding custody in May 2017. Consistent with that agreement, the Child remained enrolled in the Swedish healthcare system, and the Respondent continued to receive child welfare benefits from the Swedish government for the benefit of the Child.

While the Child's return date was not fixed with certainty (as evidenced by the lack of a return plane ticket), it is clear that the parties anticipated the Respondent and the Child returning to Sweden no later than May 2017 (and possibly earlier, if the Respondent could not find employment). The Petitioner testified that, on his part, this expectation never changed, but that the Respondent's intent changed in early 2017. The Respondent's unilateral

change of heart, however, does not alter the child's habitual residence of Sweden. "[W]here the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period . . . courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." Maxwell, 588 F.3d at 251 (quoting Mozes, 239 F3d at 1077) (internal quotation marks omitted).

Other evidence of the parties' intent indicates that the move was not intended to be permanent. Although the Respondent obtained employment and enrolled the Child in preschool upon arriving in the United States, the Respondent only rented a room in a house in West Asheville, which indicates a lack of intent to reside here permanently. She has not rented or purchased a home in the area. Additionally, before leaving Sweden, the Respondent enrolled the Child in a Swedish preschool. She signed a tenancy agreement with the Petitioner, an agreement which allowed her to seek a housing allowance from the Swedish government but also ensured her a place to live upon her return. As previously mentioned, the Respondent maintained a Swedish bank account and continued to receive a child benefit from the Swedish government. The Child remained enrolled in the Swedish

healthcare system during her stay in the United States. Additionally, the Respondent kept belongings at the Petitioner's home, as did the Child.

At the hearing, the Respondent testified that the Petitioner had offered to move to the United States so as to be close to the Child. The evidence presented by the parties, however, indicates that while both parties took some preliminary steps toward seeking legal immigration status for the Petitioner in the United States, these were discontinued and this idea was never earnestly pursued by either party.

All of this evidence leads the Court to conclude that the Respondent's move to the United States with the Child was intended to be of a limited duration and that the parties did not have a shared, settled intent to abandon Sweden as the Child's country of habitual residence.

### B.    Acclimatization

Having determined that the parents lacked a shared, settled intent to change the Child's country of habitual residence, the Court next considers the extent of the Child's acclimatization to the United States. In considering the issue of acclimatization, the Fourth Circuit has cautioned that the issue "is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether the child's relative attachments to the countries have changed to the point where ordering the child's return would

now be tantamount to taking the child out of the family and social environment in which its life has developed." Maxwell, 588 F.3d at 253-54 (quoting in part Mozes, 239 F.3d at 1081) (internal quotation marks and brackets omitted). In evaluating this issue, the Court should consider whether the child is enrolled in school; the child's participation in social activities; the length of the child's stay in the respective countries; and the child's age. Maxwell, 588 F.3d at 254.

"To infer abandonment of a habitual residence by acclimatization, the objective facts must point *unequivocally* to the child's ordinary or habitual residence being in the new country." Murphy v. Sloan, 764 F.3d 1144, 1152 (9th Cir. 2014), cert. denied, 135 S. Ct. 1183 (2015) (quoting Mozes, 239 F.3d at 1081) (emphasis in original; internal quotation marks and other alterations omitted). While the Court should consider the extent of the child's contacts in the new country, "in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." Mozes, 239 F.3d at 1079.

The Respondent argues that the Child has acclimatized to living in the United States such that her habitual residence is now here. In so arguing, the Respondent emphasizes that the Child is thriving, that she is happy and outgoing, that she has a number of friends, and that she enjoys preschool.

These facts, while significant, do not "unequivocally" establish that Sweden is no longer her country of habitual residence. While the Child is well-adjusted in the United States, she spent the first three years of her life in Sweden. She has maintained significant contacts with Sweden, in that she is in regular contact with her father, as well as her Swedish aunt and cousins. As noted previously, the Child remains enrolled in preschool in Sweden and continues to be a patient in the Swedish healthcare system. The Child is currently only four years old, and therefore is not of an age where is she strongly attached to any particular school or social environment. Karkkainen v. Kovalchuk, 445 F.3d 280, 296 (3d Cir. 2006) (noting that the issue of acclimatization is "secondary" in a case involving a very young child "because the child lacks the ability to truly acclimatize to a new environment").[1]

For all of these reasons, the Court concludes that the Child has not acclimatized to living in the United States to such an extent and in such a manner that it can be said that her country of habitual residence has been

---

[1] The Respondent also argued that it would be improper to return the Child to Sweden as she no longer speaks Swedish. (As noted, the Petitioner disputes this and maintains that he is able to communicate with the Child in Swedish). To the extent that the Child has lost any ability to speak or understand Swedish, this is likely due to the fact that she is not around Swedish speakers on a daily basis. Given that she spent three-quarters of her life speaking both English and Swedish, and given her young age, it is likely that the Child will quickly resume bilingual communications if she were to return to Sweden.

abandoned. The Child's habitual residence was, and continues to be, the country of Sweden.

Therefore, the Court concludes that the Petitioner has established by a preponderance of the evidence that when the Respondent failed to return the Child to Sweden as agreed by the end of May 2017 that the Child was retained from her country of habitual residence in violation of the Petitioner's custody rights in violation of the Hague Convention and ICARA.

## C. Affirmative Defenses

Having determined that the Petitioner has shown that the Child was wrongfully retained, the Court now turns to the affirmative defenses asserted by the Respondent. A child who has been wrongfully removed or retained should not be returned to his or her country of habitual residence if the removing party can establish one of the following defenses:

> (1) there has been a delay of more than one year in bringing the petition and the child is well-settled in the new environment;
>
> (2) the petitioner consented or acquiesced to the removal or retention of the child;
>
> (3) the petitioner failed to exercise his or custody rights;
>
> (4) return would expose the child to a grave risk of harm; or

> (5) return would violate fundamental principles of
> human rights.

Hague Convention, arts. 12, 13, 20.[2]  The first three of these defenses must

be shown by a preponderance of the evidence.   The last two of these

defenses must be shown by clear and convincing evidence.

The Respondent asserts three affirmative defenses to the Petitioner's

claim.  In her first affirmative defense, she argues that the Child has resided

in the United States since September 2016 and is now well-settled here.

This defense, however, is applicable only if the Petition was filed more than

one year after the wrongful removal/retention.  Here, the wrongful retention

occurred at the end of May 2017,[3] the date when the parties agreed that the

Child would return to Sweden and they would make an agreement about

future custody arrangements.   The Petitioner filed the present Petition on

---

[2] While technically not a defense, the Convention also vests courts with the discretion to refuse to return a child if the child objects to being returned.  In assessing a child's objections to return, the court must consider the child's age and level of maturity.  Hague Convention, art. 13.  Given that the minor child in this case is only four years old, this is potential defense is not an issue in this case.

[3] Arguably the wrongful retention occurred as early as February 2017, when the Respondent unilaterally and anticipatorily repudiated the parties' agreement.  The Court need not make a finding as to the precise date that the wrongful retention occurred, however, as this action was still filed within one year of the wrongful act, even if such occurred as early as February 2017.

November 1, 2017. Because the Petition was filed less than one year after the wrongful retention, this defense is not available to the Respondent.

In her second and third affirmative defenses, the Respondent raises the defenses of consent and acquiescence. As the Third Circuit has explained:

> [T]he defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. Although the law construing the consent defense under the Convention is less developed, the defense of acquiescence has been held to require an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time. Courts have held the acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced.

Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) (internal citations and quotation marks omitted).

For the reasons stated by the Court in finding that the parties lacked a shared settled intent to abandon Sweden as the Child's country of habitual residence, the Court finds that the defense of consent is not applicable to this case. As the Court has found, the Petitioner consistently intended for

the Child to return to Sweden no later than May 2017; at no time did he consent to a permanent relocation or even a stay of an indefinite nature.

As for the defense of acquiescence, the Respondent has not presented any evidence to demonstrate that the Petitioner acquiesced to the Respondent's decision not to return to Sweden. When the Respondent advised the Petitioner that she did not intend to return, he became very upset and threatened to report her to the authorities. While Respondent instituted custody proceedings in the United States, Petitioner deliberately chose not to participate in that action. See Larbie v. Larbie, 690 F.3d 295, 309 (5th Cir. 2012) (finding that mother acquiesced to U.S. court making final custody determination by filing a counterclaim in custody dispute and participating in proceedings). Instead, he promptly initiated the procedure with the Swedish Government and the U.S. State Department to facilitate the return of the Child, and when that procedure failed, he promptly commenced the present judicial proceedings. As such, the Respondent failed to meet her burden regarding the defense of acquiescence in this case.

## IV.    CONCLUSION

In summary, the Court finds that the Child was wrongfully retained from her country of habitual residence in violation of the Petitioner's custody rights, and the Respondent has not established any of the asserted

affirmative defenses by a preponderance of the evidence.  Accordingly, the Court concludes that the Child must be returned to Sweden in accordance with the terms of the Hague Convention, where the Swedish Courts will determine any further matters of custody regarding the Child.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Petitioner's Verified Petition for Return of a Minor Child [Doc. 1] is **GRANTED**, and judgment shall be entered in favor of the Petitioner. The Petitioner shall forthwith return to Sweden with the Child and shall seek the determination of the Swedish Courts regarding the custody, support, and visitation of the Child. The Respondent shall not interfere in any respect with such return.

**IT IS FURTHER ORDERED** that the Petitioner shall have fourteen (14) days to file any application for attorney's fees and other expenses incurred in prosecuting the Petition.

The Clerk is respectfully directed to: (1) return the Respondent's passport to the Respondent and the Child's passport to the Petitioner; (2) provide a copy of this Order to the Clerk of Superior Court of Buncombe County, North Carolina for filing in the Court File of <u>Lisa M. Bailey v. Karl H.</u>

Sundberg, File No. 17-CVD-1829; and (3) enter a Judgment consistent with this Memorandum of Decision and Order contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: December 29, 2017

Martin Reidinger
United States District Judge